UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    v.<br><br>RAFAEL DAVILA,<br>    a/k/a "ROBBIN HOOD,"<br>JOSE TORRES,<br>    a/k/a "GOLDY," a/k/a "GOLDY TECH,"<br>NICOLAS DAVILA,<br>CARLOS FONSECA,<br>    a/k/a "CHARLITO,"<br>ZACHARY MARSHALL,<br>SANTO FELIBERTY,<br>ALEX OYOLA,<br>    a/k/a "DIRTY,"<br><br>       Defendants | M.J. No. 23-5178-JGD |

**GOVERNMENT'S MOTION FOR DETENTION**

The United States of America moves for pretrial detention, pursuant to the Bail Reform Act, 18 U.S.C. § 3141 et seq., of all seven defendants charged in this case:

- RAFAEL DAVILA, a/k/a "ROBBIN HOOD,"
- JOSE TORRES, a/k/a "GOLDY," a/k/a "GOLDY TECH,"
- NICOLAS DAVILA,
- CARLOS FONSECA, a/k/a "CHARLITO,"
- ZACHARY MARSHALL,
- SANTO FELIBERTY,
- ALEX OYOLA, a/k/a "DIRTY,"

As alleged in the complaint, and as supported by the affidavit in support of the criminal complaint of FBI Taskforce Officer Christopher Ryan ("Complaint Affidavit")[1] and Exhibits to this motion, each of the defendants stands charged as part of a conspiracy that stole thousands of catalytic converters. Each of the defendants is on pretrial, is on probation, or has multiple prior convictions. The Defendant face significant penalties and the evidence is overwhelming. Consequently, the Defendant pose a significant

---

[1] References to the Complaint Affidavit are by page number (Aff., _), and Exhibits to this motion by number (Ex. _).

danger to the community, and a serious risk of flight.  No conditions of release can address the danger or the risk of flight, and the Defendants must be detained.

## I.   MAXIMUM PENALTIES

The offenses alleged in the criminal complaint carry the following maximum penalties.

    a.   Conspiracy to Transport Stolen Property Valued Over $5,000 in Interstate Commerce, in violation of 18 U.S.C. § 371: not more than five years in prison, up to three years of supervised release, a fine of up to $250,000, a $100 special assessment, forfeiture, and restitution.

    b.   Interstate Transportation of Stolen Property Valued Over $5,000, in violation of 18 U.S.C. § 2314: not more than ten years in prison, up to three years of supervised release, a fine of up to $250,000, a $100 special assessment, forfeiture, and restitution.

    c.   Conspiracy to Steal More than $1,000 from a Federally Insured Bank, in violation of 18 U.S.C. § 371: not more than five years in prison, up to three years of supervised release, a fine of up to $250,000, a $100 special assessment, forfeiture, and restitution.

    d.   Theft of More than $1,000 from a Federally Insured Bank, in violation of 18 U.S.C. § 2113(b): not more than ten years in prison, up to three years of supervised release, a fine of up to $250,000, a $100 special assessment, forfeiture, and restitution.

    e.   Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h): not more than twenty years in prison, up to three years of supervised release, a fine of up to $500,000 or twice the value of the property involved in the transaction, whichever is greater, a $100 special assessment, forfeiture, and restitution.

## II.   ELIGIBILITY FOR DETENTION

As to each of the Defendants, the government moves for detention under the following provisions of the Bail Reform Act:

    1.   18 U.S.C. § 3142(f)(1)(A), because the defendants are charged with a "crime of violence" as defined by the Bail Reform Act, for which a maximum term of imprisonment of 10 years or more is prescribed;[2]

---

[2] The Defendants are charged with violating 18 U.S.C. §§ 2314, and 2113(b), which are "crime[s] of violence", under the residual clause. As that provision states, a "crime of violence" includes "(B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(4) (emphasis added).[2] See United States v. Mitchell, 23 F.3d 1, 3 (1st Cir. 1994) (affirming district court's finding that aiding and abetting an arson is a "crime of violence" for purposes of the Bail Reform Act); United States v. Chowdhury, Crim. No. 23-8005-PGL, ECF #28 (Feb. 13, 2023) (Levenson, M.J.) (citing Watkins, and finding entitlement to dangerousness hearing under residual clause of 18 U.S.C. § 3156(a)(4)(B)).  Violations of 18 U.S.C. §§2314 and 2113(b) are both felonies that carry maximum prison

2.  18 U.S.C. § 3142(f)(1)(E), because the defendants are charged with felony conspiracy counts that involve the possession of firearms and dangerous weapons by coconspirators; and

3.  18 U.S.C. § 3142(f)(2)(A), because there is a serious risk that the defendants will flee.

Additionally, with respect to Defendants Jose TORRES, Zachary MARSHALL, and Santo FELIBERTY, the government moves for detention under 18 U.S.C. § 3142(f)(1)(D), because they are charged with felony offenses, and have been convicted of two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of Section 3142(f)(1), if a circumstance giving rise to Federal jurisdiction had existed. <u>See</u>, below (TORRES convicted of drug offense, and breaking and entering),[3] (MARSHALL convicted of burglary, resisting arrest), (FELIBERTY convicted of assaulting officer and burglary).

## III.    ARGUMENT

Under the Bail Reform Act of 1984, detention of a defendant is required if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The government is required to demonstrate, by a preponderance of the evidence, that a defendant poses a risk of flight or, by clear and convincing evidence, that he is a danger to the community. <u>United States v. Patriarca</u>, 948 F.2d 789, 792–793 (1st Cir.1991).  In considering the government's motion to detain the defendant, the Court must determine whether any condition or combination of conditions will reasonably assure "the safety of any other person and the

---

terms of ten years. "The 'residual clause' in 18 U.S.C. § 3156(a)(4)(B) of the Bail Reform Act is not unconstitutionally vague." <u>See</u> <u>United States v. Watkins</u>, 940 F.3d 152 (2d Cir. 2019), <u>cert. denied</u>, 140 S.Ct. 2584 (Mar. 30, 2020). "[B]ecause § 3142(f)(1) [(which incorporates § 3156(a)(4)(B)'s definition of "crime of violence")], does not define criminal offenses, fix penalties, or implicate the dual concerns underlying the void-for-vagueness doctrine, it is not amenable to a due process challenge and is therefore not unconstitutionally vague." <u>Id</u>.

[3] <u>See</u> <u>United States v. Pereira</u>, 454 F.Supp.2d 40, (D. Mass. 2006) ("The act of 'breaking and entering' is a necessary element of the Massachusetts burglary statute, and the act requires the use of some amount of physical force in attempting to gain access to the desired structure or vessel."; "a plain reading of the definition of a "crime of violence" under § 3156(a)(4)(B) certainly suggests the inclusion of offenses such as possession with intent to use burglarious tools").

community." 18 U.S.C. § 3142(e)(1).[4]  Each of the factors to be considered under the bail reform act strongly favors pretrial detention of the Defendants.  See 18 U.S.C. § 3142(g).

### A.      The Nature and Circumstances of the Offense Favor Detention

The Complaint Affidavit sets forth in detail the nature and circumstances of the offenses charged in this case. The government will not recapitulate the extensive factual recital set forth in the Complaint Affidavit except to individualize and summarize the allegations against each defendant.

### 1.      Number and Extent of the Offenses

These crimes and conduct at issue here falls squarely within Congress' definition of violent crime under 18 U.S.C. § 3156(a) – the use of force against the property of another. These crimes should be considered with the same eye toward the damage they caused to the property of others.  The crimes at issue in this case are serious, well-planned, and took place over and over again for more than 15 months. Theft was a literal business for these Defendants. They made extensive profits and are responsible for hundreds of thousands of dollars in losses.

These were no mere crimes of opportunity. Rather, they were the product of hours of research, preparation and planning that Rafael DAVILA described in detail in text message conversations. The catalytic converter thefts were conducted in front of residences, commercial parking lots and industrial areas multiple nights per week with an eye toward finding and targeting the most valuable catalytic converters. The jewelry store burglaries and ATM thefts were similarly well-planned, and methorically executed by skilled operators.  The hours-long efforts to organize and commit these thefts demonstrates the extensive planning and preparation that went into each night of crime – and there were multiple such nights

---

[4] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*."  S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see also* United States v. Patriarca, 948 F.2d 789, 792–793 (1st Cir.1991).

per week. The crimes stretched for hours, into the early mornings, and involved high-speed chases if law enforcement interdicted them.  Based on the nature and extent of the crimes, detention is warranted.

As noted in Exhibit 2, the defendants were not strangers to firearms and kept them on hand to further the conspiracy. Rafael DAVILA, in particular, possessed a Polmyer80 ghost in his residence where the stolen property was kept and stored.

  2.  **Loss Amounts**

At this preliminary stage, the government knows that not all thefts committed by the Defendants have been identified or accounted for.  However, even at this preliminary stage, the losses that can be attributed are significant.

Rafael DAVILA is clearly culpable for every theft and burglary set forth in the affidavit. That amounts to over 470 vehicles equating to approximately two million dollars in estimated losses, the two ATM thefts, the trailer theft, and two jewelry store burglaries. All this while on conditional release from Connecticut Courts where he faces five years in jail for a prior theft case.  The government estimates Rafael DAVILA being responsible for over $2,000,000 in losses, assuming a $5,000 estimated loss per vehicle.

Jose TORRES also is culpable for all of the identified catalytic converter thefts and therefore is responsible for millions of dollars in losses. TORRES himself profited extensively and the amount of money he received from the core buyers is well-documented documented in records and text messages. This documentation substantiates hundreds of thousands in proceeds being paid to him via bank transfers with indicted parties, and the hundreds of thousands more in cash transactions that are not reflected in bank records. Furthermore, the evidence supports hundreds of thousands in proceeds being paid to DAVILA alone for 2022 and 2023.  The government estimates Jose TORRES being responsible for over $2,000,000 in losses, assuming a $5,000 estimated loss per vehicle.

Nicolas DAVILA is linked in the complaint affidavit three nights of catalytic converter thefts. Specifically, those nights are November 24, 2022, November 27, 2022, and December 6, 2022.  Historical text messages suggests that he has been engaged in these thefts for far longer, and he will likely face additional thefts being attributed to him. However, as it stands, today, the three definitive nights equates to

forty-four (44) vehicles known to law enforcement that had their catalytic converters stolen. Investigators are aware of more recent thefts for which reports are still being gathered on April 4, April 6, and April 11, 2023.  Based upon an estimated $5,000 loss per vehicle, this equates to Nicolas DAVILA being presently responsible for an estimate loss amount of approximately $200,000.

Carlos FONSECA is linked to multiple nights of historical catalytic converter thefts. Those nights of catalytic converter thefts include August 23, 2022, August 25, 2022, August 30, 2022, September 1, 2022, September 6, 2022, September 8, 2022, September 13, 2022, September 15, 2022, September 20, 2022, September 22, 2022, October 2, 2022, and October 4, 2022. This equates to one-hundred and three (103) vehicles known to law enforcement that had their catalytic converters stolen. Based upon an estimated $5,000 loss per vehicle, this equates to Carlos FONSECA being responsible for an estimate loss amount of approximately $500,000 in losses.

Zachary MARSHALL is linked to multiple nights of historical catalytic converter thefts and a burglary of a storage unit. Those nights of catalytic converter thefts include January 19, 2023, January 30, 2023, February 9, 2023, February 16, 2023, February 28, 2023, March 7, 2023, and March 9, 2023. This equates to one-hundred and three (105) vehicles known to law enforcement that had their catalytic converters stolen. Additional information from the GPS tracking device and other sources suggests that MARSHALL was also involved in converter thefts on March 16, 2023, and March 21, 2023, and April 6, 2023. Based upon an estimated $5,000 loss per vehicle, this equates to Zachary MARSHALL being responsible for approximately $525,000 in losses in converter thefts.  With respect to the storage unit burglary that MARSHALL participated in, investigators attribute an estimated $13,000 in losses.

Santo FELIBERTY is linked to multiple nights of historical catalytic converter thefts, two ATM theft incidents, the trailer theft, and two jewelry store burglaries. Those nights of catalytic converter thefts include December 21, 2022, January 5, 2023, January 9, 2023, and January 26, 2023. This equates to thirty-five (35) vehicles known to law enforcement that had their catalytic converters stolen as of today's date. Additional information from the GPS tracking device and other sources suggests that MARSHALL was also involved in converter thefts on April 4, 2023 and April 11, 2023 for which reports and evidence are

still being gathered. Based upon an estimated $5,000 loss per vehicle, this equates to Santo FELIBERTY being responsible for an estimate loss amount of approximately $175,000. The two ATM theft incidents resulted in losses of approximately $21,000 in cash stolen, and loss of the ATM which was valued at approximately $15,000. The December 14, 2022, trailer theft resulted in the loss of a trailer valued at $10,000 and snowblowers valued at approximately $10,500. The jewelry store burglaries resulted in the loss of stolen property valued at $79,842, and $57,758, and damages valued at $11,812, and $9,435. In total, Santo FELIBERTY is expected to be responsible for losses of at least $390,347.

Alex OYOLA is linked to the two ATM thefts, the trailer theft, and the two jewelry store burglaries. As noted above, the two ATM theft incidents resulted in losses of approximately $21,000 in cash stolen, and loss of the ATM which was valued at approximately $15,000. The December 14, 2022, trailer theft resulted in the loss of a trailer valued at $10,000 and snowblowers were valued at approximately $10,500. The jewelry store burglaries resulted in the loss of stolen property valued at $79,842, and $57,758, and damages valued at $11,812, and $9,435. In total, Alex OYOLA is expected to be responsible for losses of at least $215,347.

### 3. Potential Penalties

As the crimes at issue in this case involve theft, the applicable guideline is USSG § 2B1.1. The government reasonably anticipates the guidelines sentence ranges for the Defendants to be in excess of 60 months based on a conservative offense level calculation, and the potential for request for upward departure[5] or variances, if necessary, to account for the prolific numbers of thefts here. The potential jail penalties in this case, which far exceed any penalties previously faced by the Defendants (except for OYOLA), all suggest that they would be inclined to flee and not answer to these charges.

Indeed, for Rafael DAVILA and TORRES who are conservatively responsible for well over a million dollars in foreseeable losses, and fall in criminal history category V or above, the anticipated guideline sentence range is well over 188 months on the low-end. By way of example, Rafael DAVILA

---

[5] See USSG § 2B1.1, cmt. 8.

faces a potential guidelines sentence range of 324 to 405 months based on an anticipated offense level of 36, and criminal history category of VI.[6]  TORRES, by comparison, faces a potential guidelines sentence range of 188 to 235 months based on an anticipated offense level of 34, and criminal history category of V.[7]  Additionally, DAVILA, FELIBERTY, MARSHALL (and potentially OYOLA) are also expected to face lengthy prison sentences for violating the terms of their probation by being charged with committing the offenses here.

     **B.**     **The Weight of the Evidence Favors Detention**

In this case, the weight of the evidence is strong as to each Defendant. The anticipated evidence at trial includes: surveillance video depicting the Defendants; physical and remote surveillance before, during and after the crimes; text messages and photographs sent and received by the Defendants to each other in furtherance of the crimes; historical GPS tracking data for the Maroon Acura MDX; and historical cell site location information and precision location information for the Defendants' cellular phones.  Considered together, this evidence paints an overwhelming picture and provides a compelling motive to flee from these charges.

As against Rafael DAVILA the case entails historical cell site location information (CSLI), and his vehicle being present at nearly every crime scene.  DAVILA sent text messages to each of the coconspirators prior to and after the thefts, and he was captured on video surveillance at various points during the conspiracy getting food, buying blades, and picking up coconspirators. Historical GPS tracking of his maroon Acura MDX conclusively places him at the scene of hundreds of thefts. Furthermore,

---

[6] This based on the following anticipated offense level calculation: base offense level 6 ((USSG §§ 2B1.1(a)(2), 2S1.1(a)(1)); +16, because loss amount is greater than $1,500,000 (USSG § 2B1.1(b)(1)(I)); +2, because the offense involved more than 10 victims (USSG § 2B1.1(b)(2)(A)(i)); +2, because the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property (USSG § 2B1.1(b)(4)); +2, because the offense involved sophisticated means (USSG § 2B1.1(b)(10)(C)); +2, because the offense involved an organized scheme to steal motor vehicle parts (USSG § 2B1.1(b)(15)); +2, because Defendant was convicted under 18 U.S.C. § 1956 for money laundering (USSG 2S1.1(b)(2)(A); +2, because the Defendant was an  organizer, leader, manager or supervisor (USSG § 3B1.1(c)); and +2, because the offense involved reckless endangerment during flight from law enforcement (USSG § 3C1.2).

[7] This would entail the same calculation as above, without 4 levels for leadership, or reckless endangerment.

DAVILA kept meticulous notes and tabulated the numbers of converters stolen and the profits he expected to make. The weight of even this short recital of the overwhelming evidence against him, heavily favors detention.

Jose TORRES is captured in documented transactions selling hundreds – if not thousands – of stolen catalytic converters and receiving hundreds of thousands of dollars in proceeds from their sale. The number of stolen converters and TORRES' profits are substantiated in extensive text message conversation taking place over iMessage and Facebook. Bank records, and invoices from the core buyers prove that the volume of these transactions was not conjecture. Furthermore, TORRES was captured on video receiving bulk deliveries of stolen catalytic converters from Rafael DAVILA at his house, and also personally making deliveries of dozens of catalytic converters to a core buyers in Connecticut. TORRES also sent extensive text messages concerning the monetization of the converters and orchestrated most of his business over his cellular phone. The weight of this evidence against heavily favors detention.

Nicolas DAVILA was captured on video during the nights of the thefts with his brother. He also exchanged text messaged with his brother concerning the crimes and the payments he expected. Indeed, one of the thefts he participated in is substantiated by historical GPS tracking of the maroon Acura MDX during the crime. Lastly, the CSLI for Nicolas DAVILA's phone further establishes his participation. The weight of this evidence heavily favors detention.

Carlos FONSECA participated in dozens of historical catalytic converter thefts with Rafael DAVILA totaling hundreds of thousands of dollars in losses. The most salient evidence against FONSECA is the historical CSLI for the phone in his name that establishes FONSECA was in the vicinity of the crimes on the nights of the thefts. FONSECA also exchanged numerous text messages with Rafael DAVILA preparing and coordinating the thefts and discussing them. The weight of this evidence favors detention.

All of the catalytic converter thefts that Zachary MARSHALL participated in with Rafael DAVILA are substantiated with historical GPS tracking of the maroon Acura MDX during the crimes. MARSHALL was captured on video before and after the thefts with Rafael DAVILA on a number of occasions. Additionally, MARSHALL's historical CSLI further establishes his presence in the vicinity of the crime

scenes. MARSHALL also exchanged numerous text messages with Rafael DAVILA and Nicolas DAVILA concerning thefts of catalytic converters. The weight of this evidence heavily favors detention.

All of the catalytic converter thefts that Santo FELIBERTY participated in with Rafael DAVILA are substantiated with historical GPS tracking of the maroon Acura MDX during the crimes.  Historical CSLI of phones linked to FELIBERTY corroborates his involvement in the thefts and burglaries as well. Lastly, FELIBERTY exchanged numerous text messages with Rafael DAVILA coordinating their meetups prior to the thefts and burglaries, and splitting the profits from their burglaries and thefts. The weight of this evidence heavily favors detention.

Alex OYOLA participated in the ATM thefts, jewelry store burglaries, and the trailer theft. Historical CSLI for OYOLA suggests that he powers down his phone during the thefts. Though CSLI for TARGET PHONE 9 does show it being present at DAVILA's residence consistent with the departure and return trips for the thefts. Text messages between OYOLA, FELIBERTY and DAVILA contain discussions of proceeds, coordination of meetups, notes regarding the sale of the stolen property, and messages preparing for the thefts.  OYOLA is also captured on surveillance video at DAVILA's residence before and after the jewelry store burglaries.

### C. The History and Characteristics of the Defendants Favor Detention

Each of the Defendants' history and characterizes weigh in favor of detention both in terms of the danger they present and their risk of flight. In considering this factor, the Court must consider "employment" or lack thereof, "record concerning appearance at court proceedings", and "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." 18 U.S.C. § 3142(g)(3). The government addresses the history and characteristics of each Defendant in turn.

#### 1. Rafael DAVILA

The government estimates Rafael DAVILA's criminal history category to be category VI. This criminal history category was hard-earned. Rafael DAVILA has multiple out of state convictions and served prison time in New York.  Rafael DAVILA also faces 5 years in Connecticut on his most recent conviction,

for which he plainly violated the terms of conditional release by committing the offenses charged here. Most of Rafael DAVILA's prior convictions involve motor vehicles, whether stealing them, stealing from them or negligently operating them. Significantly, a number of these prior convictions do not score due to age. The pertinent historical convictions are set forth as follows.

| Date | Offense | Sentence | Points |
|---|---|---|---|
| 8/23/2021 | Larceny 3rd Degree Connecticut Docket No. U04W-CR19-0458342-S | Guilty, 5 years suspended for 3 years | 1 |
| 6/8/2020 | Negligent Operation Palmer DC, 2043CR000658 | Guilty, 90 days | 2 |
| 6/8/2020 | Operating After Suspended License Palmer DC, 2043CR000816 | Guilty, 67 days | 2 |
| 4/15/2020 | Negligent Operation Palmer DC, 2043CR000594 | Guilty, 90 days | 2 |
| 4/15/2020 | Negligent Operation Palmer DC, 2043CR000596 | Guilty, 90 days | 2 |
| 3/16/2015 | Burglary 3rd Degree Albany County Court, DA484-14 | Guilty, 1 to 3 years | 3 |
| 6/4/2014 | Negligent Operation Springfield DC, 1323CR002237 | Guilty, 1 year probation | 1 |
| 6/22/2009 | Receiving Stolen Property Palmer DC, 0843CR000207 | Guilty, 6 months suspended | 0 |
| 3/3/2009 | 2x Receiving Stolen MV, 2x Altering MV VIN Springfield DC, 0823CR2025 | Guilty, 1 year probation | 0 |
| 6/2/2009 | Receiving Stolen MV Palmer DC, 0843CR000207 | Guilty, 6 months suspended | 0 |
| | On Probation During Offense (USSG § 4A1.1(d)) | | 2 |
| | | TOTAL | 15 (VI) |

Most significantly, Rafael DAVILA appears to currently be on conditional release for a theft case in Connecticut for which he was sentenced to 5 years in jail in August 2021.[8]  He appears to have been on conditional release for this Connecticut case at the time of each and every one of the hundreds of thefts charged here. Given the penalties that he faces for the instant offenses and the five years that he faces in Connecticut, Rafael DAVILA has an extremely compelling incentive to flee.

###    2.    Jose TORRES

---

[8] The police report related to this conviction is contained in Exhibit 3.

The government estimates TORRES's criminal history category to be category V.  TORRES most recently served multiple years in state prison for a Hampden Superior Court firearm case.  Prior to that state prison term, TORRES had served a number of sentences for motor vehicle and theft offenses. Like DAVILA, a number of TORRES' historical convictions do not score to age.

| Date | Offense | Sentence | Points |
|------|---------|----------|--------|
| 4/27/2015 | Possession to Distribute Class A<br>Hampden Superior, 1379CR00851 | Guilty, 2 to 3 years | 3 |
| 3/19/2014 | License Revoked as HTO<br>Holyoke DC, 1417CR000550 | Guilty, 30 days | 1 |
| 6/4/2013 | Operating after Revoked License<br>Springfield DC, 1323CR003896 | Guilty, 120 days | 2 |
| 2/12/2013 | B&E Night for a Felony<br>Holyoke DC, 1117CR001979 | Guilty, 6 months | 2 |
| 10/10/2012 | Receiving Stolen Motor Vehicle<br>Springfield DC, 1123CR004020 | Guilty, more than 60 days | 2 |
| 10/10/2012 | Negligent Operation<br>Springfield DC, 1123CR001263 | Guilty, more than 60 days | 2 |
| | | TOTAL | 12 (V) |

As noted in the Complaint Affidavit, TORRES is currently on pretrial release for two pending cases in Connecticut, and was on release for those cases during the entirety of the crimes charged here.[9]

### 3.      Nicolas DAVILA

The government estimates Nicolas DAVILA's criminal history category to be category III. Nicolas DAVILA has two continuations without findings (CWOFs) for violent offenses against law enforcement.[10] At the time of the thefts, Nicolas DAVILA was on probation.

| Date | Offense | Sentence | Points |
|------|---------|----------|--------|
| 2/17/2022 | Negligent Operation<br>Springfield DC, 2123CR006086 | CWOF, 1 year | 1 |
| 5/23/2018 | Assault and Battery Police Officer<br>Springfield DC, 1823CR003284 | CWOF, 1 year | 1 |
| 4/29/2016 | Resisting Arrest<br>Springfield DC, 1623CR002986 | CWOF, 6 months | 1 |
| | On Probation During Offense<br>(USSG § 4A1.1(d)) | | 2 |

[9] The police report related to this conviction is contained in Exhibit 4.

[10] Nicolas DAVILA also has two separate juvenile CWOFs which likely do not score. Those cases were for strangulation and suffocation of a household member in 2015, and threats in 2015.

| | | TOTAL | 5 (III) |
|---|---|---|---|

Nicolas DAVILA was also subject to four restraining orders, the most recent being issued in June 2022. Relatedly, Nicolas DAVILA was charged on December 7, 2022, with assault and battery against a household member, who was the plaintiff in one of the historical restraining orders. That case remains pending.

### 4.    Carlos FONSECA

The government estimates FONSECA's criminal history to be category II. FONSECA has one serious conviction for assault and battery by means of dangerous weapon involving the use of a tire iron.

| Date | Offense | Sentence | Points |
|---|---|---|---|
| 11/19/2014 | Assault and Battery Dangerous Weapon, to wit: Tire Iron, Hampden Superior, Docket No. 1379CR13958 | Guilty 2 years suspended. 1 year committed | 2 |
| 1/30/2012 | Threats, Assault and Battery, Malicious Destruction of Property Holyoke DC, Docket No. 1117CR1858 | CWOF 1 year probation | 1 |
| | | TOTAL | 3 |

### 5.    Zachary MARSHALL

The government estimates MARSHALL's criminal history to be category IV. MARSHALL has two serious convictions for burglary and firearm possession, and he is believed to still be on probation related to a Connecticut burglary conviction in 2018 for which he faces 4 years that was suspended.

| Date | Offense | Sentence | Points |
|---|---|---|---|
| 11/6/2018 | Burglary 2nd Degree Connecticut Court, Docket No. T19R-CR18-0112664-S | Guilty 5 years. 1 to serve, 3 years probation | 2 |
| 5/4/2018 | Possession of Firearm, PWID Class B, Resisting Arrest Springfield DC, Docket No. 1723CR4103 | Guilty 15 months | 3 |
| 10/14/2016 | Larceny from a Person Springfield DC, Docket No. 1623CR000443 | CWOF 2 years probation | 1 |
| 5/13/2013 | Receiving Stolen MV, Possession of Burglarious Tools Hampden Juvenile, DL12S1130 | Delinquent DYS committed | 1 |
| | On Probation During Offense[11] | | 2 |

---

[11] It appears from the conviction details for Docket No. T19R-CR18-0112664-S that MARSHALL a probation review was disposed on February 1, 2022, and that probation was continued, and MARSHALL

|  | (USSG § 4A1.1(d)) |  |  |
|---|---|---|---|
|  |  | Total | 9 (IV) |

### 6.    Santo FELIBERTY

The government estimates FELIBERTY's criminal history to be category V. FELIBERTY has multiple prior convictions for larceny in Connecticut for which he received eight-year sentences with portions of the sentence suspended. While incarcerated FELIBERTY appears to have engaged in an assault against corrections personnel.

| Date | Offense | Sentence | Points |
|---|---|---|---|
| 1/22/2014 | Larceny 1st Deg, Burglary 3rd Deg Connecticut Docket No. H14H-CR13-0665002-S | Guilty 8 years jail. Suspended after 3 years. | 3 |
| 10/16/2014 | Larceny 2nd Deg Connecticut Docket No. H14H-CR14-0672117-S | Guilty 8 years jail. Suspended after 2 years. | 3 |
| 3/23/2011 | Assault Personnel Connecticut Docket No. H13W-CR10-0154690-S | Guilty 3 years jail | 3 |
| 3/23/2011 | Run from Police Connecticut Docket No. H13W-MV10-0323156-S | Guilty 90 days jail | 2 |
|  | On Probation During Offense[12] (USSG § 4A1.1(d)) |  | 2 |
|  |  | TOTAL | 13 (V) |

### 7.    Alex OYOLA

The government estimates OYOLA's criminal history to be category II. As noted in the Complaint Affidavit, police reports related to OYOLA's robbery Connecticut robbery conviction revealed that it was related to a jewelry store robbery and that Rafael DAVILA and Santo FELIBERTY were identified as being involved. See Exhibit 5 (reports).

| Date | Offense | Sentence | Points |
|---|---|---|---|
| 8/1/2010 | Robbery, 1st Degree | Guilty | 3 |

---

was committed the Department of Corrections. The government believes that MARSHALL may still be on probation for this offense.

[12] It appears from the conviction details for Docket No. H14H-CR13-0665002-S that FELIBERTY a probation review was disposed on August 7, 2018, and that probation was continued, and FELIBERTY was committed the Department of Corrections. The government believes that FELIBERTY may still be on probation for this offense.

| | Connecticut Docket No. FBT-CR10-0247125-T | 14 years jail. 7 years suspended. 5 years of probation.[13] | |
|---|---|---|---|
| 1/14/2009 | Larceny, Breaking and Entering Eastern Hampshire DC, Docket No. 0898CR001550 | CWOF, 1 year probation | 0 |
| | | TOTAL | 3 (II) |

In addition to these convictions, OYOLA has a number of historical juvenile delinquent adjudications for assault and battery on police officer, assault and battery by means of a dangerous weapon, and assault by means dangerous weapon. OYOLA was committed to the Department of Youth Services for these adjudications after repeatedly violating terms of probation.

**8.      Conclusion**

As can be seen from their criminal histories, these Defendants have multiple prior adjudications and arrests for crimes involving theft and violence. The Defendants are lifelong criminals with records evidencing crimes going back many years. The thefts and burglaries charged in this case are their trade. The Defendants commit property crimes such as those charged, here, and monetize the proceeds in order to sustain themselves and accumulate assets.

The Defendants in this case committed the crimes described in the Affidavit while on probation with jail terms over their head, or while on pretrial release for other crimes, or shortly after release from terms of incarceration.  These circumstances all weight heavily in favor of detention and demonstrate that conditions of release will not assure the safety of community.

**D.      The Seriousness of the Danger Posed by Release**

As a final factor, this Court must consider "nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).  These Defendants are serious offenders and the danger they pose to the community is just as serious if released.

---

[13] The government has not definitively determined whether Alex OYOLA is currently on probation for this case. It appears from review of the Connecticut Judicial Branch website that court records from 2010 are not available online. At best, it would appear that OYOLA may have completed probation 12 years after his August 1, 2010 conviction, and therefore it would have terminated on August 1, 2022. The government includes the calculation for the Court's benefit.

"Danger, in this context, was not meant to refer only to the risk of physical violence." United States v. Tortora, 922 F.2d 880, 884 (1st Cir. 1990).[14]  Indeed, the "the Bail Reform Act of 1984, was enacted, in large part, to address growing concern that dangerous defendants were committing crimes while released on bail."  United States v. Hir, 517 F.3d 1081, 1089 (9th Cir. 2008) ("Our holding accomplishes just that: it enables the court to consider the nature of the crime with which a defendant is charged and the danger that if he were released he would commit similar crimes again.").[15] Consequently, in considering danger to the community, this Court should consider "danger" in relation to danger to the "property of another" (as the definition of "crime of violence" commands),[16] and the potential for the Defendants to commit further crimes if released.  So considered, these Defendants present an extremely serious danger to the community, and most specifically to the property of others if released.

Each of the Defendants has prior faced prior prosecutions and imprisonment for thefts, larcenies, burglaries, drug offenses, robbery or physical violence. Each (with the exception of Nicolas DAVILA) have criminal records with prior committed sentences. Among these Defendants, Rafael DAVILA, Jose TORRES, Zachary MARSHALL, FEIBERTY, and OYOLA have all been sentenced to multiple years in prison.  As noted, DAVILA, MARSHALL, FELIBERTY were on probation during the offenses ,and TORRES and Nicolas DAVILA were on pretrial release.  Despite those prior convictions, probationary terms, and pending cases, the Defendants still engaged in the crimes charged here.

In this context, the danger to the community, and the particular danger faced by the community in the form of their property being stolen and destroyed, is extremely serious and would be jeopardized every

---

[14] "Danger ... means more than a risk of physical violence"; it "also refers to the danger Defendant might engage in criminal activity to the detriment of the community." United States v. Patriarca, 776 F.Supp. 593, 597 (D. Mass. 1991)

[15] Congress enacted the Bail Reform Act in 1984 in response to "the alarming problem of crimes committed by persons on release." United States v. Salerno, 481 U.S. 739, 742, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (citation omitted).

[16] See 18 U.S.C. § 3156(a)(4) ("physical force against the person or property of another"; "substantial risk that physical force against the person or property of another may be used in the course of committing the offense").

day that these Defendants are on release. This Court can foresee the response that will result from any combination of pretrial conditions of release.  As the state courts experienced before with these Defendants: repeated noncompliance, flagrant violations, and further crimes, theft and victimization. With the exception of Carlos FONSECA, all of these Defendants have proven themselves unwilling to abide by conditions of release and terms of probation on multiple prior occasions. This Court should not expect a different result in this venue with potential penalties that are much greater.  Only detention can ensure that the property of others is not injured, harmed or stolen by these Defendants while on release. Consequently, detention is the only means to ameliorate the danger posed by the release.

     **E.**     **Execution of Search Warrants on April 12, 2023**

As noted in Exhibit 2, among the evidence recovered during the execution of search warrants at the residences of the Defendants (as of the time of this filing) was: four firearms, numerous stolen catalytic converters, 25 grams of cocaine, and other stolen property. Among the stolen property recovered was the trailer stolen on December 14, 2022, from Hooksett, NH, an Ariens snowblower, and Milwaukee tools.

**CONCLUSION**

Each of the Defendants poses a significant risk to public safety, a significant risk of flight, and a significant risk of obstructing justice.  The government reserves its rights to supplement its arguments for detention, including with information derived from the searches of certain locations that are ongoing as of this filing, and upon reviewing the full bail report (including pretrial interview) prepared by the U.S. Pretrial Services Office as to each defendant.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

/s/ *Philip A. Mallard*
Philip A. Mallard
Assistant United States Attorney
One Courthouse Way
Boston, MA 02210

<u>CERTIFICATE OF SERVICE</u>

I, Philip A. Mallard, hereby certify that the foregoing was filed through the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date:  April 12, 2023                                      */s/ Philip A. Mallard*
                                                          Philip A. Mallard
                                                          Assistant United States Attorney

Exhibits:

1.      Compact Disc Containing Surveillance Videos
2.      Detention Affidavit
3.      Materials related to Rafael Davila
4.      Materials related to Jose Torres
5.      Materials related to Alex Oyola